## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| SAHARA DOMINGUEZ,              ) | |
|                    ) | |
|         Plaintiff,     ) | |
|                    ) | |
| **v.**                  ) | **Case No.** _____ |
|                    ) | |
| **EASTERN MAINE**       ) | |
| **HEALTHCARE SYSTEMS, d/b/a**  ) | |
| **NORTHERN LIGHT HEALTH,**   ) | |
|                    ) | |
| **and**              ) | |
|                    ) | |
| **MRH CORP. d/b/a NORTHERN**  ) | |
| **LIGHT MAYO HOSPITAL,**     ) | |
|                    ) | |
|        Defendants.    ) | |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Sahara Dominguez, by and through undersigned counsel, hereby complains against Defendant Eastern Maine Healthcare Systems, d/b/a Northern Light Health, and MRH Corp., d/b/a Northern Light Mayo Hospital, as follows:

## INTRODUCTION

1.      This is an action for violation of the Federal Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the Maine Family Medical Leave Requirements Law, 26 M.R.S. § 8433 *et seq.* ("Maine FMLA").

2.      This case challenges Defendants': (1) interference with Plaintiff's rights under the FMLA and Maine FMLA and (2) retaliation against Plaintiff for exercising her rights under the FMLA and Maine FMLA.

## THE PARTIES

3.      Plaintiff Sahara Dominguez ("Plaintiff" or "Dominguez") is an individual residing in the Town of Gretna and State of Virginia, who formerly resided in the State of Maine.

4.      Defendant Eastern Maine Healthcare Systems, d/b/a Northern Light Health ("Northern Light"), is a duly organized Maine Nonprofit Corporation with a principal place of business in the Town of Brewer, County of Penobscot, and State of Maine.

5.      Defendant MRH Corp., d/b/a Northern Light Mayo Hospital ("Mayo Hospital"), is a duly organized Maine Nonprofit Corporation and a hospital that is part of Northern Light Healthcare Systems, with a principal location in the Town of Dover-Foxcroft, County of Piscataquis, and State of Maine.

6.      At all times herein relevant, Northern Light and/or Mayo Hospital was Dominguez's employer.

7.      Defendants have had more than 200 employees on their payroll in each of 20 or more calendar weeks during the current and/or preceding calendar year.

8.      Upon information and belief, Defendants were a joint employer of Plaintiff or an integrated enterprise under Maine law.

## JURISDICTION AND VENUE

9.      Venue is proper in this Court because all of the discriminatory practices alleged herein occurred in Piscataquis County, Maine.

10.    The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## BACKGROUND FACTS

9.    Dominguez began working for Mayo Regional Hospital ("Mayo Hospital") out of the Milo, Maine location on April 1, 2018.

10.    Defendants hired Dominguez to work as a Nurse Practitioner.

11.    Dominguez performed her job duties satisfactorily. Her evaluations and feedback were both positive.

12.    Dominguez is a female Latina with Middle Eastern ancestry. She identifies as a person of color.

13.    Immediately upon beginning her employment with Mayo Hospital, Dominguez observed and experienced racist behavior on a weekly basis.

14.    Dominguez reported racist behavior to Defendants in October of 2018, but they refused to investigate. Instead, Defendants rolled their eyes at Dominguez when she reported racism in the workplace.

15.    In April of 2019, Dominguez took two weeks of FMLA leave to care for her mother, who was undergoing a mastectomy due to breast cancer.

16.    Shortly after her mother's breast cancer surgery, Dominguez discovered a lump in her own breast and underwent a lumpectomy in August of 2019. As a result, Dominguez needed FMLA leave for her own serious medical condition.

17.    Dominguez was out of work for FMLA qualifying leave from August 3, 2019 until August 30, 2019.

18.    Dominguez's lumpectomy procedure occurred in September of 2019.

3

19.     Defendants only allowed Dominguez to take FMLA leave for the day of her lumpectomy but forced her to return to work the following day.

20.     Dominguez experienced complications from surgery because she did not have sufficient time off from work to recover and heal.

21.     Dominguez had to take an additional day off from work in October of 2019 to allow the surgeon to drain fluid from her breast.

22.     Dominguez's provider, Jen Tormey, Family Nurse Practitioner ("FNP"), changed Plaintiff's FMLA paperwork several times because Marie Durgin, one of Defendants' human resources representatives, called repeatedly to insist that Dominguez return to work.

23.     The front desk staff at FNP Tormey's office told Dominguez and her husband that they had never experienced an employer be so aggressive over a FMLA return to work date, demanding an earlier return to work.

24.     Because of Durgin's demands that Dominguez return to work, FNP Tormey ultimately released Dominguez to return to work earlier than previously anticipated, without notifying Dominguez or her breast cancer specialist.

9.      While Dominguez was out on FMLA leave, Durgin threatened to terminate her employment if she did not return the following Monday. Dominguez refused to return to work, citing her recovery from the lumpectomy.

10.     Defendants contacted Dominguez's medical providers so often to demand changes in the FMLA paperwork that the office said they were going to stop taking calls from the employer.

11.    On four separate occasions, Defendants' human resources representatives (including David McDermott and James Godley) threatened to terminate Dominguez's employment after her FMLA leave. Defendants refused to allow Dominguez to return to work without first getting a psychological evaluation showing that she was safe to return to work.

12.    Godley and McDermott falsely claimed that Dominguez was suffering from "provider burnout." Dominguez responded that she did not have "provider burnout," but breast cancer that necessitated FMLA leave.

13.    Even after Dominguez made it clear that she was not suffering from "provider burnout," Defendants insisted that she obtain a psychological evaluation before returning to work. Defendants also referred Dominguez to a substance abuse program.

14.    Dominguez does not have a substance abuse issue and believed the referral was made in bad faith to harass, intimidate, and retaliate against her.

15.    Dominguez's psychological evaluation revealed no issues that would prevent her from performing her duties as a Nurse Practitioner.

16.    Upon information and belief, Defendants took the above actions in retaliation against Plaintiff for taking an FMLA leave of absence.

17.    Alternatively, Defendants took the above actions in retaliation against Plaintiff for making complaints of racism in the workplace.

18.    Defendants' hostile, intimidating, and abusive actions against Plaintiff would not have occurred but for the fact that she is a person of color.

19.     Even after Northern Light assumed control of the organization where Plaintiff worked, the racist behavior in the workplace continued.

20.     Amanda Fernand was a receptionist at Mayo Hospital. Fernand told Dominguez that she was not allowed to use the staff restroom. According to Fernand, Dominguez had to use the patient restrooms because she is Latina.

21.     Dominguez reported Fernand's racist behavior and Fernand admitted making the above statement to Dominguez. However, upon information and belief, Defendants did nothing to discipline Fernand.

22.     A licensed practical nurse employed by Defendants, named Colleen Belvin, frequently referred to black patients as "niggers."

23.     On one occasion, Belvin was discussing a white female patient that was expecting a child with her partner, a black man. Belvin asked: "What would make a perfectly good white woman get pregnant by a black man?"

24.     Dominguez responded to the question by asking Belvin if she also wondered what made Dominguez's "perfectly good white" husband marry a woman of color like her.

25.     On another occasion, Belvin referred to a new physician that was coming to the practice, who was of Middle Eastern descent, as a "towel headed sand nigger."

26.     Dominguez is of Middle Eastern descent. Hearing her coworkers speak of the new physician this was way was shocking and incredibly offensive to Dominguez.

27.     A Physician's Assistant named Amanda Young often bullied Dominguez about her weight, facial hair, and appearance. On one occasion, Young circulated a photograph of an overweight, bearded man at Disney World with his family and said the man in the photograph was Dominguez.

28.     Dominguez's coworkers bullied, harassed, and abused her on a regular basis because of her race and gender.

29.     Dominguez reported these incidents of racism to Defendants in the summer of 2020.

30.     Defendants purportedly have a zero-tolerance policy for racism in the workplace. However, Defendants did not terminate the individuals engaging in the overtly racist behavior described above.

31.     Defendants performed an investigation as a result of Dominguez's complaints. Defendants concluded that a mandatory three-hour workplace sensitivity training for the employees was a sufficient response.

32.     Mayo Hospital's CEO said she was satisfied with the outcome of the investigation.

33.     After Dominguez made protected reports of racism in the workplace, her coworkers' hostile behavior toward her escalated.

34.     On a regular basis, Defendants allowed a hostile and abusive work environment to persist, which included subjecting Dominguez to dirty looks and plates being smashed on the floor in front of her. In other instances, Dominguez's colleagues engaged in hostile behavior by ignoring or refusing to speak to her.

35.     Dominguez found it impossible to do her job and care for her patients when most people in the office would not speak to her.

36.     The constant racism, retaliation, and lack of corrective action from her employer caused Dominguez to become very depressed and anxious at work.

37.     Dominguez was frequently reduced to tears at work because of her coworkers' behavior.

38.     Jennifer Goodrich was another of Defendants' human resources representatives. On August 31, 2020, after Dominguez made a protected report of racist behavior in the workplace, Goodrich responded by telling Dominguez that she needed to "learn how to get along with your coworkers." Goodrich told Dominguez to "hit the reset button" on the allegations of racist behavior, blaming Dominguez for being the victim of discrimination and retaliation.

39.     After Goodrich blamed Dominguez for not getting along with her coworkers, and when it became clear that Defendants would do nothing to combat the hostile, discriminatory, and retaliatory work environment, Dominguez concluded it was intolerable to continue working for Defendants. Defendants constructively discharged Plaintiff from employment on or about August 31, 2020.

40.     Dominguez found the working conditions so intolerable that she was compelled to resign.

59.     Objectively, any reasonable person in Dominguez's situation would have understood that it was impossible to continue working for Defendants under the conditions described above.

60.     Subjectively, Dominguez feared that if she continued working in the hostile environment created by Defendants, she was at risk of a mental breakdown or suicide attempt.

61.     Defendants knowingly allowed Dominguez's colleagues to create a hostile and discriminatory working environment based on Dominguez's race and national origin.

62.     Defendants retaliated against Dominguez for complaining to Human Resources of racism.

63.     When Dominguez was out on a scheduled leave of absence, she asked the front desk to forward any patient concerns to the other providers.

64.     One of the other providers working during Dominguez's absence, named Amanda, called a minor patient a racial slur.

65.     On August 13, 2020, Dominguez received an email from Defendants' human resources representatives (Godley and McDermott) stating that Amanda was upset she had to help care for patients during Dominguez's absence.

66.     Upon information and belief, Defendants' reasons for requiring Dominguez to get a psychological evaluation before returning to work, and for referring Dominguez to a substance abuse counselor, were really pretext for race discrimination and retaliation under Title VII and the Maine Human Rights Act.

67.     Upon information and belief, Defendants failed to take appropriate action in response to Dominguez's complaints of racism and a hostile work environment.

68.     Defendants retaliated against Dominguez for opposing a practice made unlawful by Title VII and the Maine Human Rights Act.

69.     Defendants interfered with Dominguez's state and federally protected rights to FMLA leave and retaliated against her for taking state and federally protected FMLA leave.

70.     After resigning from her job, Dominguez became even more depressed and attempted suicide on September 18, 2020. She was transported to Mayo Regional Hospital.

71.     While Dominguez was admitted to Mayo Regional Hospital for treatment, Defendants' providers failed to give her medication for diabetes. Further, Defendants failed to check Dominguez's blood sugar, they did not feed her, and they made her sit in bloody hospital sheets for days.

72.     During this admission, Defendants' medical providers continuously accused Dominguez of substance abuse and checked for track marks even after she explained that she did not use drugs.

73.     Dominguez believes the substandard care she received from Defendants was another instance of racist treatment.

74.     Dominguez filed a charge of discrimination with the Maine Human Rights Commission on April 22, 2021.

75.     Defendants took adverse actions against Dominguez as part of a continuing violation of the FMLA dating back to April of 2019, when Dominguez first took an FMLA-qualifying medical leave of absence for her mother's serious health

condition. The FMLA violations continued through August and into September of 2019, when Dominguez took a leave of absence for her own serious health condition.

76.    Defendants intentionally interfered with Dominguez's rights under the FMLA in 2019 by calling provider to shorten the length of her leave.

77.    Defendants knowingly and willfully engaged in the above discriminatory and retaliatory acts, or acted with reckless disregard to whether its conduct violated state and federal law.

## COUNT I – FMLA INTERFERENCE
### (29 U.S.C. §§ 2615(a)(1))

78.    Plaintiff repeats the allegations contained in Paragraphs 1 through 77 as if fully stated herein.

79.    In April of 2019, and continuing through September of 2019, Dominguez was eligible and qualified for leave under the FMLA.

80.    Dominguez's breast tumor and lumpectomy constituted a serious health condition within the meaning of the FMLA.

81.    Dominguez provided Defendants with appropriate notice of her need to take full and/or intermittent leave under the FMLA. In August of 2019, Dominguez requested a medical leave of absence to treat her breast tumor and recover from a lumpectomy.

82.    Defendants interfered with Dominguez's substantive rights under the FMLA by discouraging and attempting to restrain or restrict her request for a full medical leave of absence.

83.     Plaintiff did not receive all the FMLA leave she was entitled to take in 2019 as a result of Defendants' unlawful interference.

84.     As a result of Defendants' FMLA interference, Dominguez has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

85.     Defendants' violation of the FMLA was willful, justifying an award of liquidated damages under the FMLA.

WHEREFORE, Plaintiff Sahara Dominguez requests that the Court award her damages for Defendants' violation of the FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT II – INTERFERENCE UNDER THE MAINE FMLA
### (26 M.R.S. §§ 847(1))

86.     Plaintiff repeats the allegations contained in Paragraphs 1 through 85 as if fully stated herein.

87.     As set forth more fully in Count I above, Defendants' conduct amounts to unlawful interference with Plaintiff's rights under the Maine FMLA.

88.     As a result of Defendants' violation of the Maine FLMA, Dominguez has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

89.     Defendants' violation of the Maine FMLA was willful, justifying an award of liquidated damages under the Maine FMLA. Alternatively, Plaintiff is

entitled to liquidated damages of $100 per day beginning on the date that Dominguez became eligible and qualified for FLMA leave in 2019.

WHEREFORE, Plaintiff Sahara Dominguez requests that the Court award her damages for Defendants' violation of the Maine FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT III – FMLA RETALIATION
### (29 U.S.C. §§ 2615(a)(2))

90.     Plaintiff repeats the allegations contained in Paragraphs 1 through 89 as if fully stated herein.

91.     For all of the reasons set forth above, Defendants' conduct amounts to unlawful discrimination and retaliation against Plaintiff for taking FMLA leave in April, August, and/or September of 2019.

92.     As a result of Defendants' discrimination and retaliation in violation of the FMLA, Dominguez has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

93.     Defendants' violation of the FMLA was willful, justifying an award of liquidated damages under the FMLA.

WHEREFORE, Plaintiff Sahara Dominguez requests that the Court award her damages for Defendants' violation of the FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT IV – RETALIATION UNDER THE MAINE FMLA
### (26 M.R.S. §§ 847(2))

94.     Plaintiff repeats the allegations contained in Paragraphs 1 through 93 as if fully stated herein.

95.     As set forth more fully in Count III above, Defendants' conduct amounts to unlawful retaliation and discrimination against Plaintiff under the Maine FMLA.

96.     As a result of Defendants' violation of the Maine FLMA, Dominguez has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

97.     Defendants' violation of the Maine FMLA was willful, justifying an award of liquidated damages under the Maine FMLA. Alternatively, Plaintiff is entitled to liquidated damages of $100 per day beginning on the date that Dominguez became eligible and qualified for FLMA leave in 2019.

WHEREFORE, Plaintiff Sahara Dominguez requests that the Court award her damages for Defendants' violation of the Maine FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## JURY TRIAL DEMAND

Plaintiff Sahara Dominguez hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Respectfully submitted,

Dated:  September 1, 2021                /s/ Laura H. White

_____

Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*lwhite@whiteandquinlan.com*

/s/ Danielle M. Quinlan

_____

Danielle M. Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*dquinlan@whiteandquinlan.com*